# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

GARY BAINUM, et al.,

      Plaintiffs,

      vs.

BAKERY, CONFECTIONARY, TOBACCO
WORKERS AND GRAIN MILLERS
INTERNATIONAL UNION, et al.,

      Defendants.

Civil Action No. 1:03-cv-926

Dlott, J.
Hogan, M.J.

**REPORT AND
RECOMMENDATION**

This matter is before the Court on Bakery, Confectionery, Tobacco Workers and Grain

Millers International Union, AFL-CIO-CLC Local 253 ("Local 253")'s motion for summary

judgment (Doc. 44), Defendant Bakery, Confectionary, Tobacco Workers and Grain Millers

International Union ("International Union")'s and Defendant Bakery and Confectionery Union

and Industry International Pension Fund ("Pension Fund")'s motion for summary judgment

(Doc. 47), Plaintiffs Gary Bainum[1] and James Tipton's motion for summary judgment (Doc. 48,

as supplemented by Doc. 50), and the parties' opposing and reply memoranda. (Docs. 52, 53, 54,

59, 60).

Plaintiffs bring this action pursuant to the Employee Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, against the Pension Fund, International Union, and

Local 253 (collectively, "Defendants").  Plaintiffs' amended complaint alleges violations of 29

U.S.C. §§ 1132(a)(1)(B) and 1140, which correspond to ERISA Sections 502(a)(1)(B) and 510,

---

[1]On November 1, 2005, Plaintiff Gary Bainum passed away. (Doc. 51).  His surviving spouse, Carol Bainum, in her official or fiduciary capacity as executor of Plaintiff Estate, has been substituted for Plaintiff Gary Bainum (Doc. 64) pursuant to Fed. R. Civ. P. 25, and joined to this action in her individual capacity pursuant to Fed. R. Civ. P. 19(a)(2)(i). (Doc. 68).

respectively.  ERISA section 502(a)(1)(B) provides that a participant or beneficiary of a pension plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  ERISA Section 510 prohibits discrimination "against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. . . ." 29 U.S.C. § 1140. In a nutshell, Plaintiffs allege that Defendants unlawfully suspended a portion of their vested pension payments in violation of ERISA section 502(a)(1)(B), and that Defendants interfered with their pension benefits by reducing their benefits to a "level inconsistent with the plan" and failing to treat them equally to other beneficiaries in violation of ERISA section 510.

## FACTUAL BACKGROUND

Plaintiff Gary Bainum worked for the Keebler Company from March of 1969 until December 1, 2000.  Plaintiff James Tipton was a Keebler employee from May of 1970 to November 30, 2001.  Both Plaintiffs were members of Local 253.  From December 1987 through December 1999, Plaintiffs served as full-time officers of Local 253, with Bainum serving as president and Tipton as the financial secretary/treasurer.  Beginning in December of 1999, both Plaintiffs returned to employment in the Keebler plant, and Bainum continued as the part-time financial secretary. *Id.*

Pursuant to a collective bargaining agreement between Keebler and Local 253, members

2

of Local 253 are participants in the Pension Fund. (Doc. 47, Exh. H at ¶ 10, Declaration of Lewis Davis ("Davis Decl.")).[2]  Keebler – like all employer participants in the Pension Fund – is required to make contributions to the Fund on behalf of the employees covered by the collective bargaining agreement. (Doc. 47, Exh. C, at FUND 1964).  The particular benefit levels under each such agreement are negotiated.  Higher pension benefit levels require higher contributions. (Doc. 47, Exh. B, at § 4.26, FUND 1196-97).

Local 253's full-time officers are also participants in the Pension Fund. (Doc. 47, Exh. H, at ¶ 11).  The pension benefit level for officers of a local union is determined by the local union under the provisions of its bylaws, rather than through negotiation with an employer. *Id.* Once a local union determines the pension benefit level for which it wishes to make contributions on behalf of its officers, the Fund requires the local union to submit two documents in order to entitle its officers to become eligible to receive a pension at that level–a pension

---

[2]Plaintiffs contend that the Declarations of Lewis Davis and Joseph Thibideau are not admissible for purposes of supporting Defendants' motion for summary judgment because they conflict with their deposition testimony in several respects. (Doc. 54 at 3-7).  For example, Plaintiffs allege that Mr. Davis at ¶ 5 of his declaration states he was involved in preparing and presenting materials to the Appeals Committee relating to the appeals of Bainum and Tipton. (Doc. 47, Exh. H).  Plaintiffs allege that Davis's declaration contradicts his deposition testimony:

> Q. At that time that you were before the board of trustees, did you present any evidence to the board of trustees?
> A. No, we— we do not present anything. We sit and listen to the trustees. We don't make any comments or anything on their — their deliberations.

(Davis Depo. at p. 28, lines 20-22 to p. 29, lines 1-3, p. 114-A errata sheet).  However, Plaintiffs omit the testimony that immediately follows which makes it clear that while Davis did not comment orally on the deliberations, he in fact presented documentary evidence to the Appeals Committee:

> Q.  Did you present any documents on behalf of the pension fund to the board of trustees at Mr. Bainum's appeal that he willfully made a false statement to the pension fund?
> A.  We presented the documents that the fund had in his –in his file, plus the documents that he had sent in during his appeal.  All of that was put together and put in his appeal.

(Davis Depo. at p. 29, lines 4-11).  The Court has reviewed the allegedly conflicting citations set forth in Plaintiffs' brief and is not persuaded that, when read in context, the deposition testimony is in conflict with the declarations.  Therefore, the Court denies Plaintiffs' request to strike the Davis and Thibideau declarations.

resolution and a pension agreement. (Doc. 47, Exh. I, at 55, Deposition of Lewis Davis).

(requiring).  Under the pension resolution, the a local union "shall make contributions to the . . .

Fund" at the specified rate and "in accordance with the contribution rate schedule set forth in . . .

Article I, Section 1.21" of the Rules and Regulations of the Fund. (Doc. 47, Exh. A, at 25).  The

pension agreement provides that a local union's decision to make contributions at the specified

level is done "in accordance with a duly authorized Resolution of [the Local Union's] Executive

Board." (Doc. 47, Exh. A, at 26).  The Fund relies on that representation. (Davis Depo., at 56).

If, however, the Fund receives information that calls that representation into question, the Fund

reviews the facts and makes any necessary adjustments to the applicable pension benefits.  (*Id*. at

66-67).

Plaintiffs' compensation as full-time officers was covered by the Local Union's bylaws

which expressly stated that they would receive salaries equal to what they would be making as

hourly workers working 40 hours of straight time and eight hours of overtime. (Doc. 47, Exh. D,

Art. IV, Section 1).   As officers, Plaintiffs received benefits, including a pension, equivalent to

what they would have been making in the plant. (Bainum Depo. at 29-30, 52, 128; Tipton Depo.

at 8, 67, 122).  When pensions for regular members went up under a new negotiated contract

with Keebler, pensions for officers went up by the same amount. (Bainum Depo. at 128; Tipton

Depo. at 122).  From 1973 to 1999, the pension benefit levels for officers of Local 253 were the

same or less than the pension benefit levels that were negotiated with Keebler for the members

of Local 253. (Bainum Depo. at 30-31)

Plaintiffs present affidavit evidence that in March 1997, Bainum attended a meeting of

the Executive Committee of Local 253 and proposed increasing the pension levels for officers of

Local 253 to the highest level permitted by the Pension Fund.  Ronald Hooks, Sr., a member of

the Executive Board of Local 253, made a motion to increase the officers' pension to the highest

level permitted by the Bakery Confectionery International Pension Fund. (Doc. 48, Hooks aff. ¶

3, Hazlett aff. ¶ 3, Bainum aff., Combs aff., Graham aff., Pearson aff., Summers aff., Terwilliger

aff.).  Plaintiffs' affidavits state that the members of the Executive Committee in attendance

approved increasing the pension level of the officers of Local 253 to the highest level permitted

by the Pension Fund at the March 8, 1997 Executive Board meeting. (Doc. 48, Hooks aff. ¶ 5,

Hazlett aff. ¶ 5 Bainum aff., Combs aff., Graham aff., Pearson aff., Sommers aff., Terwilliger

aff.).  Plaintiff Tipton avers that in May 1997, immediately before the general membership

meeting, the Trustees of Local 253 were advised of the officers' increase in the pension levels

and the health benefit changes for those officers. (Doc. 48, Tipton aff. ¶ 12).  Plaintiffs present

the affidavits of Plaintiff Tipton and Donald Hazlett, a member of Local 253's Executive Board

in 1997, which aver that in May 1997 the issue of the increase in the pension level of officers of

Local 253 was presented at that general membership meeting and the members voted to approve

the increase in the pension level of officers of Local 253 to the highest pension level permitted

by the pension fund. (Doc. 48, Tipton aff. ¶ 13, Hazlett aff. ¶ 6).[3]  Plaintiffs state that the pension

contribution level of Bainum and Tipton was not immediately implemented by Local 253

because both Plaintiffs required only 504 hours of payment at the higher pension contribution

level to qualify for the maximum officer's pension. (Doc. 48, Tipton aff. ¶ 14; Davis Depo. at

106, line 5-16).  Bainum and Tipton's term of office with Local 253 did not end until December

---

[3]As explained *infra*, this affidavit evidence was not presented to the Appeals Committee and is not part of the
administrative record before the Court.  Therefore, this evidence may not be considered by the Court in its review of
Plaintiffs' ERISA Section 502(a)(1)(B) denial of benefits claim.  In any event, the Court notes that the May 1997
Meeting Minutes do not reflect that the March 1997 minutes were read or approved by the membership. (Doc. 47, Exh.
T).

1999. (Doc. 48, Tipton aff. ¶ 5). Tipton did not make pension payments at the increased pension level prior to July 1999 as Bainum and Tipton were not required to have a continuous payment of their pension at the increased level for a period of more than 504 hours. Bainum and Tipton would be eligible for the increased pension if Local 253 commenced payments at the increased level in July 1999 to meet the required 504 hours at the higher pension level. (Doc. 48, Tipton aff. ¶ 14, 15 and 16).

On July 1, 1999, the pension benefit level for members of Local 253 under the Keebler agreement was $1,100. (Doc. 47, Exh. A, at 18; Exh. H, at ¶ 13). On August 2, 1999, Gary Bainum signed a pension agreement and pension resolution and submitted them to the Fund to increase the pension benefit level for officers from their $950 level to $2,300, effective July 1, 1999. (Doc. 47, Exh. A at 17, 25-26; Exh. H, at ¶ 14). This resulted in an increase in the contributions to the Fund from Local 253 from $1.80 per hour to $5.6625 per hour. (Doc. 47, Exh. A at 25-26; Davis Decl., Exh. H, at ¶ 14).

On December 28, 1999, Gary Bainum signed another pension agreement and pension resolution increasing the pension benefit level for officers to $2,600, also effective July 1, 1999, and submitted those to the Fund. (Doc. 47, Exh. A, at 27-28; Memo from Hurt to Bergin at ¶ 9, Exh. A, at 18; Davis Decl., Exh. H, at ¶ 14). Local 253's contributions increased to $7.31 per hour. (Doc. 47, Exh. A, at 27-28; Davis Decl., Exh. H, at ¶ 14). Local 253 continued to pay at the increased pension contribution level for the succeeding President of Local 253 through and including January 2002. (Doc. 48, Tipton aff. ¶ 18).

Tipton, as the Financial Secretary/Treasurer of Local 253, prepared monthly financial reports to the Executive Board of Local 253 (income and expense of the Local per month),

6

quarterly financial reports to the International Union (income and expense of the Local for three month periods), quarterly financial reports to Trustees of Local 253 and the general membership at the quarterly trustee meetings and general membership meetings (income and expense of Local 253 for three month periods), an annual financial report in February of every calender year (income and expenses for the prior calender year of Local 253), Labor Management report to the National Labor Relations Board annually (income and expense of Local 253), Internal Revenue Service reports of the Local (form 990), monthly employer remittance report to the Bakery Confectionery International Pension Fund for officers' pensions of Local 253 and numerous other reports to federal, state and local agencies. (Doc. 48, Tipton aff. ¶ 20).  The foregoing reports detailed the financial condition of Local 253. (Doc. 48, Tipton aff. ¶ 20).  The financial reports submitted by Tipton concerning the financial condition of Local 253 were approved by Local 253's Executive Committee, Trustees and general membership and included the enhanced officers' pension contributions. (Doc. 48, Tipton aff. ¶ 21; Shouse Depo. p. 23, line 21-25, p. 24, line 1-11).  Neither the International Union, the Pension Fund, nor the federal or state governments questioned the reports submitted by Tipton. (Doc. 48, Tipton aff. ¶ 21).  During the period July 1999 through and including September 2001, no reports prepared by Tipton were questioned concerning Local 253 by any member of Local 253. (Doc. 48, Tipton aff. ¶ 21, Hazlett aff. ¶ 10, Hooks aff. ¶ 10).  All reports prepared by Tipton and submitted to the Executive Board, Trustees, the general membership of Local 253 and to the International Union from July 1999 all contained the increased costs for the officers' pensions. (Doc. 48, Tipton aff. ¶ 18).

In December 1999, Bainum chose not to seek an additional term as President of Local 253 and Tipton did not seek reelection to the position of Financial Secretary/Treasurer of Local 253. (Doc. 48, Tipton aff. ¶ 5).  In December 1999, Local 253 continued making payments at the highest pension contribution level for officers of Local 253. (Doc. 48, Tipton aff. ¶ 18).

In October 2000, Bainum submitted his retirement pension application and request for pension benefits to the Fund. (Bainum Depo., Exh. 2; Doc. 47, Exh. K).  The Fund approved Bainum's application, and from December 2000 through February 2002, the Fund paid Bainum a monthly pension in the amount of $3,566, based on the $2,600 officers' pension benefit level. (Doc. 47, Exh. A, at 11-12).

In the Spring of 2001, Local 253 had a debt in excess of $30,000. (Doc. 47, Letter from K. Yeager to F. Hurt (Aug. 21, 2001) ("Yeager Report"), Exh. L).  Fifty-one members of Local 253 submitted a petition to the International Union requesting that the International Union review the books and records of Local 253 to determine the basis and legitimacy of the debt incurred. *Id.*  In August 2001, Kurt Yeager, Director of Finance and Administration for the International Union, conducted such a review and produced a report detailing the reason for the debt and proposing solutions for retiring the debt. *Id.*  In a letter dated August 21, 2001 to the president of the International Union, Yeager attributed the financial condition of Local 253 to the payment of health benefit reimbursements for officers of Local 253 who were not covered by the health insurance premiums. *Id.* [4]  The letter also states:  "Effective July 1, 1999 the pension level

---

[4]Plaintiffs do not contend that the International Union did anything improper by sending Mr. Yeager to review the Local's records and produce a report. (Tipton Dep., Exh. F, at 147; Bainum Dep., Exh. E, at 202-03).  Nor did Yeager find any willfully fraudulent behavior on behalf of Bainum or Tipton during the period they were officers of Local 253. (Yeager Depo. p. 29, lines 3-22).

for officers of Local 253 was increased from $950 per month at retirement to $2,600 per month at retirement. When the pension level was improved the contribution rate increased from $1.80/hour to $7.31/hour, tripling the monthly pension contribution amount." (Doc. 47, Exh. L, at INTL 0050).

Yeager's report was submitted to the International Union President, Frank Hurt, who in turn provided a copy of the report to Local 253.  In September of 2001, Yeager's report was read to the Executive Board of Local 253. (Doc. 47, Exh. M, at INTL 0040).  The following month, some members of Local 253 began raising questions about whether and when either the Executive Board or the general membership had authorized such an increase in the pension benefit level for officers. (Doc. 47, Exh. N, at INTL 0043).  The Local 253 bylaws provide that the decisions of the Executive Board must be approved by the general membership at the next regular general membership meeting. (Doc. 47, Exh. D, Art. V, Section 4).  In October of 2001, Ronald Shouse, an officer of Local 253, sent a letter to the International Union questioning whether the pension level increase had been properly authorized. (Doc. 47, Exh. A, at 112).

International President Hurt directed Local 253 President David Richardson to hold a special meeting of Local 253 for purposes of conducting a vote on the pension levels for Local 253 officers. (Richardson Depo. at 25, 56).  Local 253 scheduled a vote of the membership on January 6, 2002 on whether to authorize the increase of the pension benefit level or to set the officers' pensions at the level available to the membership. (Doc. 47, Exh. A, at 14).[5]  On January 6, 2002, by a vote of 167 to 6, the Local 253 membership voted to "roll back" or reduce

---

[5]The notice states, "On Sunday January 6, 2002 there will be a SPECIAL UNION MEETING to vote to keep or reduce the full time officers pension." (Doc. 47, Exh. A, at 14).

the pension benefit level for its officers back to the level available to the membership. (Doc. 147, Exh. A, at 13, 15).

Lewis Davis, the Pension Fund Manager of Bakery Confectionery International Pension Fund, testified that he understood that the effect of the vote taken by Local 253 to be that the Local Union had never authorized pension benefits for the officers at the $2,600 level. (Davis Depo., at 72, 110).  However, Davis admitted that he did not know whether the ballot language he received was actually what the members of Local 253 voted on.  He also admitted that the ballot language "To Keep the Pension Level 'AS IS'" or "To 'ROLL-BACK' the Pension Contribution Increase" did not state that the union never authorized the increase in the pension level in the first instance. (Davis Depo., at 111-112 and Exh. 16).

Subsequent to the vote, the Fund reduced the pensions of Bainum and Tipton.  On January 30, 2002, the Fund notified Mr. Bainum that because "the $2600 pension benefit level under which [his] pension benefit was based, was not authorized by . . . Local 253's Executive Board or membership . . . [the Fund had] recalculated" his monthly pension to $1,832 per month, based upon a rate of $1,200 per month, which was the pension benefit level that Keebler provided for members of Local 253 when Mr. Bainum retired. (Doc. 47, Exh. A, at 11; Davis Depo., at 72, 110).  That letter further notified Mr. Bainum that he had a "right to request the Appeals Committee of the Board of Trustees to review the Fund's findings." (Doc. 47, Exh. A, at 11).

On December 17, 2001, Mr. Tipton applied for pension benefits. (Doc. 47, Exh. Q). Prior to his retirement, Tipton had contacted the Fund and was advised on May 11, 2000 that he qualified for an officer's pension at a rate of $3,394.00. (Doc. 48, Tipton aff. ¶24).  On January

10

30, 2002, the Fund informed Mr. Tipton that he was entitled to receive a pension in the amount of $1,732 per month. (Doc. 47, Exh. R). On or about February 1, 2002, Tipton began receiving a monthly pension benefit of $1,732.00.

On March 20, 2002, both Plaintiffs requested an administrative review of the decision to pay them a monthly pension benefit below the $2,600 pension benefit level. (Doc. 47, Exh. A, at 22-24). Mr. Bainum and Mr. Tipton argued that the "basis for [their] appeal is that the pension level was approved at an Executive Board meeting [on March 8, 1997]." (Doc. 47, Exh. A, at 22). In support of their appeal, Plaintiffs submitted affidavits from eight individuals, including Mr. Bainum, each of which was signed in March of 2002, and in which each affiant stated that the "members in attendance [at the March 1997 Executive Board meeting] approved the maximum pension increase for Bainum and Tipton." (Doc. 47, Exh. A, at 117-24).

The Pension Fund subsequently requested that the International Union provide a report to assist the Appeals Committee in its consideration of Plaintiffs' appeal. (Doc. 47, Davis Decl., Exh. H, at ¶ 7; Memo from Hurt to Bergin, Exh. A, at 16; Yeager Report, Exh. L). The Fund does not have an investigative arm, and therefore asked the International – as a "neutral party" not involved in the dispute between the Plaintiffs and the Local–to review the circumstances surrounding the increase of the pensions to the $2,600 level. (Doc. 47, Davis Decl., Exh. H, at ¶7).

On August 29, 2002, the Appeals Committee denied the Plaintiffs' appeal. The Appeals Committee denied the appeal "because the increase to $2,600 was not properly authorized by Local 253." (Doc. 47, Exh. S, at P 0001). The Appeals Committee letter states:

> Local 253's bylaws reflect that the officers are to receive compensation which is
> based on the hourly compensation at Keebler. The hourly compensation at

11

Keebler includes Keebler's participation in the Pension Plan.  As of March 1997, the Keebler pension benefit level was $1,000, having recently been increased from $950.  The local officers' pension benefit level was $950 and could have been increased then to $1,000 to match the plant level without amending the bylaws.  If the Local desired to increase the pension benefit level above $1,000, that change would have had to have been accomplished by an amendment of the bylaws.  The bylaws provide that amendments must be adopted by the membership at a membership meeting following two readings.  The bylaws were never amended in that fashion and, therefore, the increase was not properly authorized by the Local.

You assert that the increase was accomplished by a vote of the Local's Executive Board at its March 8, 1997 meeting.  The material reviewed by the Committee does not support your assertion.  The Committee's review noted that the minutes of that meeting do not reflect that there was a vote to increase the pension benefit level. Rather, they reflect only that the Executive Board approved "exploring" ways to increase officer pensions.  No subsequent meeting minutes reflect any further action on this point.  Moreover, the Local's actions after March 8, 1997 are not consistent with there having been such a vote.  That is, the Local did not begin contributing at the $2600 level for over two years following the March 8, 1997 meeting.  Based on that evidence, the form affidavits from some of the Board members executed 5 years after the meeting stating that there was such a vote were simply not persuasive.  In any event, for the reasons described above, membership approval and not just Executive Board approval was required to accomplish the change.

(Doc. 47, Exh. S, at P 0001-P 0002).

Thereafter, Plaintiffs filed the instant federal lawsuit.


## I.  SUMMARY JUDGMENT SHOULD BE GRANTED FOR DEFENDANTS ON PLAINTIFFS' ERISA SECTION 502(a)(1)(B) CLAIM.

In a denial of benefits action brought under ERISA Section 502(a)(1)(B), 29 U.S.C.

§ 1132(a)(1)(B), the Court must base its review of the merits solely upon the underlying

administrative record; the Court may not consider any evidence that was not presented to the

Plan administrator. *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir.

1998)(Gilman, J., concurring).  The Court "may consider evidence outside of the administrative

record only if that evidence is offered in support of a procedural challenge to the administrator's decision." *Id.* The Sixth Circuit has determined that summary judgment procedures are inconsistent with the appropriate standard of review for recovery of benefits claims under ERISA. *Id.* Instead of using the summary judgment mechanism, the Court must review the administrative record applying either a *de novo* or an arbitrary and capricious standard of review, as appropriate, and render a decision on the merits by determining whether the denial of benefits was proper under the terms of the Plan. *Id.* at 619-20; *Smith v. Aetna U.S. Healthcare*, 312 F. Supp.2d 942, 949 ( S.D. Ohio Mar. 29, 2004).

A beneficiary may challenge an ERISA plan administrator's decision to deny benefits under 29 U.S.C. § 1132(a)(1)(B). When a beneficiary raises such a challenge, the Court must review the administrator's decision under a *de novo* standard, unless "the benefit plan in question gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan grants discretionary authority to the administrator, the Court must apply the highly deferential arbitrary and capricious standard to its review of the benefits decision. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). While the plan need not include "magic words" such as the term "discretionary" or some other specific terminology, in order to vest the plan administrator with discretion, the grant of discretionary authority must be "clear" in order to trigger the arbitrary and capricious standard of review. *Hoover v. Provident Life & Acc. Ins. Co.,* 290 F.3d 801, 807 (6th Cir. 2002); *Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 555 (6th Cir. 1998)(*en banc*).

Under an arbitrary and capricious standard, the Court must affirm the administrator's decision if the record evidence establishes a reasonable basis for the decision. *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693-94 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990). Under the *de novo* standard of review, however, the Court must consider "the proper interpretation of the plan and whether an employee is entitled to benefits under it" based solely on the record that was before the administrator. *Perry v. Simplicity Engineering*, 900 F.2d 963, 966-67 (6th Cir. 1990). *See also Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372, 1376 (6th Cir. 1996); *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1372 (6th Cir. 1994). *De novo* review simply means a determination "whether or not the Court agrees with the administrative decision based on the record that was before the administrator." *Perry*, 900 F.2d at 966.

The Plan in the instant case provides in pertinent part that "[t]he Board of Trustees is the Plan Administrator. . . ." (Doc. 47, Exh. B, at FUND 1146). The Plan also provides that the "Trustees have full and complete authority to interpret and administer the Plan, and to make final and binding decisions regarding eligibility for benefits and all other interpretations of Plan terms." (Doc. 47, Exh. B, at FUND 1146). Section 8.04 of the Plan's Rules and Regulations provides:

> The Trustees, *and any committee of the Trustees* designated by the Trustees in accordance with the Trust Agreement, *shall* have the exclusive right, power, and authority, *in their sole and absolute discretion*, to administer, apply and interpret the Plan and any other Plan documents and to decide all matters arising in connection with the operation or administration of the Plan. Without limiting the generality of the foregoing, the Trustees, and any committee of the Trustees designated by the Trustees in accordance with the Trust Agreement, shall have the *sole and absolute discretionary authority* to:
>
> (a) take all actions and make all decisions with respect to eligibility for, and the amount of, benefits payable under the Plan;

14

(b) formulate, interpret and apply rules, regulations and policies necessary to administer the Plan in accordance with its terms;
(c) decide questions, including legal or factual questions, relating to the calculation and payment of benefits under the Plan;
(d) determine the standard of proof required in any case;
(e) resolve and/or clarify any ambiguities, inconsistencies and omissions arising under the Plan or other Plan documents; and
(f) process, and approve or deny, benefit claims and rule on any benefit exclusions.

All determinations made by the Trustees, or any committee of the Trustees designated by the Trustees in accordance with the Trust Agreement, with respect to any matter arising under the Plan shall be *final and binding* on all affected Participants, their Beneficiaries, and any other persons who claim benefits from the Plan through any of them. The Trustees may delegate such duties or powers as they deem necessary to carry out the administration of the Plan.

(Doc. 47, Exh. B, at § 8.04, FUND 1210 (emphasis added)).  Appeals regarding an entitlement to benefits are reviewed by the Appeals Committee of the Board of Trustees of the Fund ("Appeals Committee") pursuant to a delegation in the Rules and Regulations. (Doc. 47, Exh. B, at § 8.05 (c)-(f), FUND 1211).  Acting in that capacity, the Appeals Committee has the "sole and absolute discretion, to administer, apply and interpret the [Pension] Plan and any other Plan document" and to make determinations of eligibility for, and the amount of, benefits. (Doc. 47, Exh. B, at § 8.04, FUND 1210).

The Plan language in the instant action supports a finding that the Plan grants discretion to the plan administrator and persuades the undersigned that the proper standard of review in this case is arbitrary and capricious.  Courts have found similar plan language granting discretion to the Plan Administrator to warrant an arbitrary and capricious standard of review.  *See, e.g.*, *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 457 (6th Cir. 2003) (providing "[t]he Plan Administrator shall make the rules and regulations necessary to administer the Plan and shall have the responsibility and discretionary authority to interpret the terms of the Plan, determine

15

eligibility for benefits and to determine the amounts of such benefits"); *Hunter v. Caliber System, Inc.*, 220 F.3d 702, 710 (6th Cir. 2000) (granting plan review committees "sole and absolute discretion to interpret the provisions of the Plan (including, without limitation, by supplying omissions from, correcting deficiencies in, or resolving inconsistencies or ambiguities in, the language of the Plan)...."). Thus, the Court must apply the deferential "arbitrary and capricious" standard in reviewing the decision of the Appeals Committee in this case.

Under the arbitrary and capricious standard of review, this Court must determine whether the Appeals Committee's denial of Plaintiffs' appeal "is the result of a deliberate, principled reasoning process and . . . is  supported by substantial evidence." *Glenn v. Metlife*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).  The Court must determine whether the Appeals Committee's decision was rational in light of the Plan's provisions. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003); *Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health and Welfare Trust Fund*, 203 F.3d 926, 933-34 (6th Cir. 2000).  The Appeals Committee's decision will be upheld if the administrative record can support a "reasoned explanation" for the decision. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005) (citing *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)).  The "explanation must be consistent with the quantity and quality of the . . . evidence that is available on the record." *Moon*, 405 F.3d at 381 (internal quotation and citation omitted).

The arbitrary and capricious standard of review is not a mere rubber stamp of the plan administrator's decision. *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004).  As the Sixth Circuit stated in *McDonald*:

> [T]he district court had an obligation under ERISA to review the administrative
> record in order to determine whether the plan administrator acted arbitrarily and
> capriciously in making ERISA benefits determinations. This obligation inherently
> includes some review of the quality and quantity of the . . . evidence and the
> opinions on both sides of the issues. Otherwise, courts would be rendered to
> nothing more than rubber stamps for any plan administrator's decision as long as
> the plan was able to find a single piece of evidence--no matter how obscure or
> untrustworthy--to support a denial of a claim for ERISA benefits.

347 F.3d at 172.  "Deferential review is not no review, and deference need not be abject."
*McDonald*, 347 F.3d at 172 (internal quotation and citation omitted).  In determining whether the
Appeals Committee's denial decision was arbitrary and capricious, the Court is limited to
reviewing the materials in the administrative record. *Peruzzi v. Summa Med. Plan*, 137 F.3d 431,
433-34 (6th Cir. 1998).

A review of the evidence in the administrative record in this case indicates that the
Appeals Committee's decision upholding the Fund's decision to pay Plaintiffs a monthly pension
benefit below the $2,600 pension benefit level was not arbitrary and capricious, but a rational
decision based on the conflicting evidence before it.  The Appeals Committee's decision that the
increase of the Plaintiffs pensions to the $2,600 benefit level was not properly authorized by
Local 253 is supported by substantial evidence in the administrative record.[6]  Plaintiffs claim that
the increase was approved by a vote of Local 253's Executive Board at its March 8, 1997.  In
support of this claim, they submitted affidavits executed in 2002 by several Local 253 members
to the Appeals Committee. (Doc. 47, Exh. A, at A-117 to A-124).  However, the minutes from
the March 8, 1997 meeting do not reflect such a vote.  The minutes state:

---

[6]Plaintiffs, in support of their motion for summary judgment, present the affidavits of Donald Hazlett, Ronald
Hooks, Sr., and James H. Tipton which were executed in November 2005. (Doc. 50).  These affidavits were not
submitted to the Appeals Committee in support of Plaintiffs' appeal and cannot be considered by the Court in its review
of Plaintiffs' claim under 29 U.S.C. § 1132(a)(1)(B).  Absent a procedural challenge to the administrator's decision, the
Court's review is limited to the administrative record of the benefit determination. *Wilkins,* 150 F.3d at 619.

> Bainum & Tipton want the avenue to look into other pension opportunities.  A
> Motion by Hooks, seconded by Tyus to investigate other opportunities to help
> increase their pension.  Motion carried.

(Doc. 47, Exh. A, A-017, A-029).  The minutes of this meeting support the Appeals Committee's

conclusion that the Executive Board approved "exploring" ways to increase the officers'

pensions rather than an actual vote to increase the pension benefit level.  In addition, the Appeals

Committee found no subsequent meeting minutes to support Plaintiffs' claim, nor did Plaintiffs

submit evidence of Local 253 meeting minutes describing a vote to set the officers' pensions at

three times the level that members received under the Keebler contract.  The Appeals Committee

also considered the actions taken by Local 253 subsequent to the March 8, 1997 meeting.  In this

regard, the evidence showed that the Local union did not begin contributing to at the $2,600

level until two years after the meeting,[7] an action inconsistent with the claim made by Plaintiffs.[8]

In view of this evidence, the Appeals Committee's rejection of Plaintiffs' form affidavits to the

contrary is deemed rational.

Finally, the Appeals Committee found the increase in the pension rate for the officers was

not properly authorized because the Local 253 bylaws were never amended to permit such an

increase.  The Local 253 bylaws provide the officers with the same membership benefits as all

members share. (Doc. 47, Exh. D, Art. I, § 5, and Tipton Depo. at 118-119).  It is for this reason

that raising the pension level of officer to that of the membership pension level did not require

any action or approval by the Executive Board and general membership. (Tipton Depo. at 122).

Thus, the Appeals Committee reasonably concluded that since the bylaws were never amended

---

[7]See Doc. 47, Exh. A, at A-025-026.

[8]Plaintiffs contend that the delay in payments was ultimately to save the union money since the requisite 504 hours could be met in July 1999 when the actual payments commenced. (Doc. 48, Tipton aff. ¶ 14, 15 and 16; Doc. 54 at 10).  The fact that this alternate explanation exists does not make the Appeals Committee's decision irrational.  The Committee was granted "sole and absolute discretionary authority" to interpret and apply the rules and regulations in administering the Plan and to resolve legal or factual questions relating to the calculation and payment of benefits under the Plan. (Doc. 47, Exh. B, at FUND 1210).  That the Committee resolved the issue contrary to the position offered by Plaintiffs was within their purview under the Plan.

to increase the officers' pension level beyond that of the general membership level and no such amendment was ever adopted by the membership at a membership meeting following two readings (Doc. 47, Exh. D, Art. XII, § 3), the increase was not properly authorized by Local 253.

In view of the above evidence, the Appeals Committee presented a reasoned explanation for its denial of pension benefits at the $2,600 level. Although the Appeals Committee was faced with conflicting evidence, its choice to discredit the affidavits proferred by Plaintiffs does not render its decision arbitrary and capricious. While denying the higher level of pension benefits is not the only possible reasoned explanation to draw from the evidence in the administrative record, this Court's review of the Appeals Committee's action is not to identify the only, or even the best, resolution, but rather whether the Committee offered a reasoned explanation for the denial. *See Williams,* 227 F.3d at 712. On the facts before the Court, the Committee offered a reasoned explanation for its decision that Local 253 had not authorized the pension level increase for its officers.[9] Its decision should be upheld.

---

[9]Plaintiffs contend that the Rules and Regulations of the Pension Fund prohibit a reduction in or modification of their vested pension benefits in the absence of a finding of willful fraud. (Doc. 48 at 11-12). Plaintiffs' argument is premised on the assumption that their pension benefits at the $2,600 level were "vested." The Appeals Committee determined that benefits at the $2,600 level were never authorized by Local 253. Since the Court finds that decision is not arbitrary and capricious, Plaintiffs were never "vested" at the $2,600 pension benefit level. Therefore, their argument is without merit.

## II.  SUMMARY JUDGMENT SHOULD BE GRANTED FOR DEFENDANTS ON PLAINTIFFS' ERISA SECTION 510 INTERFERENCE CLAIM.

In addressing Plaintiffs' ERISA Section 510 interference claim against Local 253 and the International Union,[10] the Court applies the summary judgment standard.  *See, e.g., Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 506 (6th Cir. 2004); *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1113 (6th Cir. 2001).  A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Under Rule 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action.  *Celotex Corp.*, 477 U.S. at 323.  The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial.  *Anderson*, 477 U.S. at 249-50.  The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

ERISA § 510 provides in pertinent part:

---

[10]Plaintiffs do not seek summary judgment against the Defendant Pension Fund on their Section 510 claim. Their motion for summary judgment alleges interference with their pension benefits by Local 253 (Doc. 48 at 15-17) and interference by the International Union (Doc. 48 at 17-18), but not by the Fund.  The Fund, however, seeks summary judgment in its favor on any Section 510 claim Plaintiffs may have raised in their amended complaint. (Doc. 47 at 24-28).

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title, section 3001 [29 U.S.C. § 1201], or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this title, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140.  Section 510 prohibits two types of conduct: adverse action taken because a participant availed himself of an ERISA right (an "exercise" or "retaliation" violation), and interference with the attainment of a right under ERISA (an "interference" violation). *Coomer v. Bethesda Hosp., Inc*., 370 F.3d 499, 506 (6th Cir. 2004) (citing *Mattei v. Mattei,* 126 F.3d 794, 797 n. 4 (6th Cir. 1997).  The prohibitions of Section 510 "were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980).  In this case, Plaintiffs allege an interference violation.

"To avoid summary judgment on a § 510 interference claim, 'an employee must show that the employer engaged in prohibited conduct for the purpose of interfering with the employee's attainment of any right to which he may become entitled under an ERISA-protected plan.'" *Coomer,* 370 F.3d at 506 (quoting *Roush v. Weastec, Inc.,* 96 F.3d 840, 845 (6th Cir. 1996)).  To establish their Section 510 interference claim, Plaintiffs must present evidence showing that Defendants "had the specific intent of avoiding ERISA liability" when they took the prohibited action. *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1113 (6th Cir. 2001).  *See also Abbott v. Pipefitters Local Union No. 522,* 94 F.3d 236, 242 (6th Cir.  1996) (plaintiff "must demonstrate that the action at issue was taken with the specific intent to violate ERISA, *i.e.*, that a motivating factor in the defendant's action was the purpose of interfering with

21

the plaintiff's entitlement to benefits").  Plaintiffs can demonstrate "specific intent" through either direct evidence or through a burden shifting approach similar to that utilized in employment discrimination cases. *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997).  In the absence of direct evidence of discriminatory intent, Plaintiffs must show the existence of  "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992) (quoting *Gavalik v. Continental Can Co.,* 812 F.2d 834, 853 (3d Cir. 1987)).  *See also Smith*, 129 F.3d at 865.

Plaintiffs must also show "a causal link between pension benefits and the adverse employment decision." *Smith*, 129 F.3d at 865 (citations omitted).  Plaintiffs must present evidence from which a reasonable jury could find that Defendants' desire to avoid pension liability was a determining factor in their prohibited conduct. *Id*.  In other words, in a Section 510 interference claim, "the alleged illegal activity [must] have a causal connection to the plaintiff's ability to receive an identifiable benefit." *Mattei v. Mattei,* 126 F.3d 794, 808 (6th Cir. 1997).

If Plaintiffs state a prima facie case under § 510, Defendants can rebut the presumption of impermissible action raised by the prima facie case by coming forward with "evidence of a legitimate, nondiscriminatory reason for its challenged action." *Smith*, 129 F.3d at 865.  In this event, the burden then shifts back to Plaintiffs to show that Defendants' proffered reason was mere pretext. *Id*.  While Plaintiffs "need not show that [Defendants'] sole purpose . . . was to interfere with [Plaintiffs'] entitlement to benefits," they must "either prove that the interference was a motivating factor in [Defendants'] actions or prove that [Defendants'] proffered reason is unworthy of credence." *Id.* (Citations and quotations omitted).  If Plaintiffs fail to establish a

22

prima facie case or fail to rebut Defendants' proffer of a legitimate, nondiscriminatory reason for their actions, summary judgment should be granted for Defendants.

In the instant case, Plaintiffs contend that Ronald Shouse, then-Vice President of Local 253, made "wild" and unsubstantiated allegations in his letter to International Union President Hurt that "not one dues paying member or officer of the Local was aware of this [pension] increase" for the officers' pensions, when in fact the affidavit evidence presented by Plaintiffs shows that members who attended the March 8, 1997 Executive Board meeting of Local 253 were aware of and approved the increase. Plaintiffs allege that "Shouse . . . was a ring leader in the effort to interfere with the pension benefits of Bainum and Tipton" and "agitate[d] the International Union to reduce the officers' pension level." (Doc. 48 at 15). Plaintiffs state that "International Union President Hurt gave an express direction to Local 253 President Richardson to hold a special meeting to vote on the pension levels of the officers of Local 253" and that Richardson communicated the results of the vote to Fund Manager Davis who then acted on the vote and reduced Plaintiffs pensions "although both qualified and were vested at the $2,600 level." (Doc. 48 at 16). Plaintiffs cite to deposition testimony of Davis indicating that but for the vote of Local 253, he would not have rolled back the pension level benefits of the Plaintiffs. (Davis Depo. at 87-90).[11] The gist of their Section 510 interference claim is that Local 253 "malcontents" through their complaints to the International Union induced the International Union President to order the vote on the officers' pensions which ultimately resulted in the unauthorized "roll back" of their pensions by the Fund.

Plaintiffs fail to establish their Section 510 interference claim. First, Plaintiffs have failed to present evidence showing Defendants engaged in prohibited conduct for the purpose of

---

[11]Davis further testified, however, that he understood the vote to mean that the Local had never authorized the increase at the outset. (Davis Depo. at 110). In any event, the final decision to reduce the pension benefit level was made not by Mr. Davis, but by the Appeals Committee, and there is no evidence that the Appeals Committee relied on the Local's vote to determine that the increase had not been authorized.

interfering with the "attainment of any right to which [Plaintiffs] may become entitled." Plaintiffs' Section 510 claim is premised on the belief that they were vested at the $2,600 pension benefit level.  But, as explained above and as the Appeals Committee reasonably found, the increase was never approved by the membership of Local 253 and therefore Plaintiffs were never "entitled" to the increase in the pension level.  Therefore, the complaints by the Local (through Shouse), the subsequent investigation by the International Union, and reduction by the Fund cannot constitute "adverse actions" or "prohibited conduct" under Section 510 because such actions did not interfere with a right to which Plaintiffs were entitled.  *See Coomer*, 370 F.3d at 506.  *See also Smith,* 129 F.3d at 865-66 (where employee failed to make a showing he was "disabled" under the short-term and long-term plans and was entitled to benefits at time his short-term benefits were terminated).  If Plaintiffs were not entitled to the higher pension level, then reducing the benefit to the authorized level did not interfere with an ERISA-protected right. Therefore, Plaintiffs have failed to establish a prima facie case under Section 510.

Second, even if Plaintiffs established a prima facie case, they have failed to present evidence showing that Defendants' proffer of legitimate, nondiscriminatory reasons for their actions was a pretext for discrimination.  Defendants present evidence that when faced with a debt in excess of $30,000, Local 253 members requested the International Union to investigate to determine the basis and legitimacy of the debt incurred.  The Local was facing severe financial problems and had a legitimate desire to avoid assuming obligations it had not approved.   The International Union responded to the Local's request by conducting a review of the books and records of Local 253, and communicating the results to the Local and the Fund.  Once a question concerning the correctness of the pension benefit level for the officers was raised, the International Union and the Fund had the right and the duty to determine if the nearly threefold increase in the pension level for officers had been authorized by the Local membership.  It is undisputed that the International Union has a responsibility to respond to requests from Local

24

Unions. (Tipton Depo. at 157-58; Doc. 47, Exh. P, at ¶ 2).  In addition, the Local Unions are the front-line representatives for members of the International Union and cannot perform that function adequately if they are not financially stable.  Consequently, the International wants to make sure that Local Unions are not burdened by unauthorized financial obligations. (Doc. 47, Exh. P, at ¶ 3).  Plaintiffs concede that the International Union had the right and obligation to conduct a financial review in response to a letter of complaint. (Bainum Depo. at 202; Tipton Depo. at 157-58).  The Fund, having

received information calling into question the legitimacy of the pension increase, reviewed the Local's bylaws to determine the correct authorization procedure.  Lewis Davis, the pension fund manager, testified that absent such questions, he would not have reviewed the files. (Davis Depo. at 20).  Defendants have presented evidence of legitimate, nondiscriminatory reasons for the activities they undertook in response to requests from the Local 253.

Plaintiffs have failed to present "evidence from which a reasonable jury could find that [Defendants'] desire to avoid [higher pension level benefit] liability was a determining factor" in the actions taken. *Majewski,* 274 F.3d at 1114 (citation omitted). Despite Plaintiffs' contention that there is no evidence of fraud on their parts, even in the absence of fraud, Plaintiffs have produced no evidence that the International Union or Fund ever received other complaints about unauthorized pension increases which they failed to investigate.  The fact that Plaintiffs' pension benefits were ultimately reduced to their authorized level is in itself insufficient to establish their Section 510 interference claim.  Otherwise, every defendant faced with a request to investigate financial records would be subject to a § 510 interference claim. *Majewski,* 274 F.3d at 1113. Plaintiffs have produced no evidence that would permit a reasonable inference that Defendants were motivated to review the Local's financial records and by-laws and communicate such information to the Fund to prevent Plaintiffs from receiving a higher level of pension benefits. Since Plaintiffs have failed to rebut Defendants' legitimate, non-discriminatory reasons for

determining whether membership of Local 253 had properly authorized the three-fold increase in officers' pension benefits, summary judgment should be granted for Defendants on Plaintiffs' ERISA Section 510 claim.

Finally, to the extent Plaintiffs may be attempting to raise for the first time in their memorandum in opposition to Defendants' motion for summary judgment a Section 503 claim of a denial of a "full and fair review" of their appeal based on the involvement of the International Union's president in Plaintiffs' appeal (Doc. 54 at 6-7), that allegation simply does not appear on the face of Plaintiffs' Amended Complaint. Plaintiffs may not amend their complaint through their opposition memorandum and the Court declines to consider such claim. *See Tucker v. Union of Needletrades, Industrial and Textile Employees,* 407 F.3d 784, 788 (6th Cir. 2005). While Plaintiffs' Amended Complaint does allege that *the Fund* "violated the conditions and terms contained the plan by its failure to notify the Plaintiffs of the date or time for hearing on their appeal and thereby preventing the Plaintiff's from being heard concerning Plaintiffs' appeal" (Doc. 23, ¶48), Plaintiffs were not entitled under the Plan or case law to a personal appearance before the Appeals Committee. (Doc. 47, Exh. B, at FUND 1144); *see Hlinka v. Bethlehem Steel Corp.,* 863 F.2d 279, 287 (3d Cir. 1988); *Brown v. Retirement Committee of Briggs & Stratton Retirement Plan,* 797 F.2d 521, 534 (7th Cir. 1986); *Sawyer v. Potash Corp. of Saskatchewan (Potashcorp),* 417 F. Supp.2d 730, 744 (E.D.N.C. 2006); *Dabertin v. HCR Manor Care, Inc.,* 177 F. Supp.2d 829, 848 (N.D. Ill. 2001); *Birdsell v. United Parcel Service of America, Inc.*, 903 F. Supp. 1338, 1350 (E.D. Mo. 1995). Plaintiffs submitted written comments and supporting documentation in support of their appeal, all of which were considered by the Fund in making its decision. Since the Plan does not afford Plaintiffs a right to an in-person hearing, the failure to grant one to Plaintiffs does not violate ERISA.

26

**IT IS THEREFORE RECOMMENDED THAT:**

1. Defendants' motions for summary judgment (Docs. 44, 47) be **GRANTED**.

2. Plaintiffs' motion for summary judgment (Doc. 48) be **DENIED**.



Date:  __2/23/2007_____                          _s/Timothy S. Hogan_____
                                                  Timothy S. Hogan
                                                  United States Magistrate Judge

27

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

GARY BAINUM, et al.,
      Plaintiffs,

      vs.

BAKERY, CONFECTIONARY, TOBACCO
WORKERS AND GRAIN MILLERS
INTERNATIONAL UNION, et al.,
      Defendants.

Civil Action No. 1:03-cv-926

Dlott, J.
Hogan, M.J.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **TEN (10) DAYS** after being served with a copy thereof.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **TEN DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).